Morton J.
afterwards drew up the opinion of the Court.* The only material question raised in the present case, is whether the plaintiff, on the day mentioned in his declaration, had a right to vote in the First Parish in Malden.
This parish, in its territorial limits, is coincident with the town of Malden. The town originally constituted one parish, and all its inhabitants were liable to be assessed for parochial expenses.
In 1819 a baptist society, or, as it is frequently, though not *344 very accurately denominated, a poll parish, was created by an act of the legislature. Soon afterwards two societies of methodists were formed, and organized according to the statute of 1811, c. 6. And in April 1828, another congregational society was formed, and' organized under the statute of 1823, c. 106.
Of this last society the plaintiff was a member from its organization till July 29th, 1828, when he obtained from the clerk thereof a certificate that he had withdrawn from the society and ceased to be a member thereof. The plaintiff presented this certificate to the clerk of the First Parish,.as evidence that he had separated from the society aforesaid, and thereupon claimed to be a member of the First Parish, and to have a right to vote in all its meetings.
The plaintiff, being an inhabitant of the parish, and having all the other qualifications of a voter, was entitled to give his suffrage, if he was a member of the corporation. He had voluntarily, though without a change of residence, withdrawn. He desired to return. The parish did not consent to receive him. Could he become a member without its consent ? Has a parish the power to determine who may become members of it ? Or is it, like a town, bound to receive all who may reside within its territorial limits, and choose to partake of its corpo-. rate privileges ?
This is an important question, the decision of which may deeply affect the peace and harmony of religious territorial corporations. The influx of strangers into a parish may produce division where union existed before, may change the religious character of the corporation, or where there are funds may divert them from the purposes for which they were originally intended, to those very different or perhaps directly opposite.
The decision of this question may have a tendency to shake the parochial system of the Commonwealth. Whether this system as originally established, was, or was not, beneficial in its effects or just in its operation, we have no need now to inquire. Under its influence the Commonwealth has grown up, and it is believed is not behind its sister States, in the moral or religious character of its inhabitants. It is however verv *345 obvious, that this system was better suited to the early state of the country than to the present; and that however it might have been formerly, it has been so modified and changed, that the present parishes retain very few of the attributes of the original ones, except their burdens and liabilities. Whether this system, under its present modifications, or as it existed in any period of our history, is adapted to the present state of society, or is valuable to the community, is a question which does not fall within our province to determine.
We have however maturely considered the question arising in the present case, carefully examined the history of the legislation upon the subject, and compared the many statutes, early and late, bearing upon it, and have come to a conclusion which I am now to state.
It cannot be necessary to premise, that our duty requires us to declare what the law is, and not what in our opinion it ought to be. To decide whether a law is wise or unwise, whether it ought to be repealed, amended, or preserved, belongs to another department of the government. I will however remark, that our decision in this case, has been adopted reluctantly and only from a clear conviction that the law will admit of no other reasonable construction.
Our ancestors, deeply imbued with religious sentiment and deeming the prevalence of morality and religion essential to the well-being and prosperity of communities as well as individuals, very early made provision for the settlement of ministers and the support of public worship. In looking into the history of the settlement of this country, and the early legislation upon the subject of religion, I cannot but remark, that the first settlers, though smarting themselves from persecution, looked not to any adequate measures to protect others from the same evil; and while they provided for the most perfect enjoyment of religious worship themselves, they seemed not to recollect that others might differ from them and yet be entitled to protection in the enjoyment of the same privileges.
In the progressive improvement of civil society, a knowledge of civil rights usually if not invariably precedes that of religious rights. The former being practical in their operation and effect, are generally better understood and more respected than *346 the latter. Accordingly our ancestors evinced a much better knowledge of civil than of religious liberty. And having come from a country where an ecclesiastical establishment- was a part of the government, and as such supported at the public expense ; where articles of faith were regulated by law, and where the head of the civil government was also the head of the church ; they could not reasonably have been expected so far to throw off the influence of education and to break the shackles of prejudice, as at once to provide for that entire separation between civil power and religion, and to establish that perfect freedom in religious faith and worship, which is now claimed and in a great degree enjoyed in this country.
At the time of the emigration of the pilgrims, not only in the country whence they came, but in all Christendom, religion was an engine of state, and the support and protection of the latter was deemed indispensable to the preservation and maintenance of the former. This alliance had existed for ages ; and the light of inspiration alone could have taught them at once that its dissolution, so far from endangering or destroying the Christian religion, would promote its purity and increase and perpetuate its beneficial influence.
In the early periods of our history, we find that the government maintained a superintendence over the ecclesiastical affairs of the Commonwealth : and instances are numerous, in which the governor and magistrates were appealed to, and lent their aid, in the settlement of religious controversies.
The leading principle, in the religious system of the colony," is the compulsory support of public worship, and the liability of every inhabitant to contribute towards its maintenance. This principle runs through all the legislation upon the subject, both under the colonial and the provincial governments. It was incorporated into our constitution, and is now an operative provision of it. To the practical operation of this principle many exceptions have been made, but it never has been abandoned. It is now a prominent feature of our parochial laws.
The original mode of supporting public worship, was by the several towns. And towns were established as well with a view to parochial duties as to the management of municipal affairs. Each town was required “ to be constantly provided *347 of an able, learned, orthodox minister,” and every inhabitant of the town was liable to taxation for his support. Anc. Chart. 103, 244. And not only in the settlement of ministers, but in all elections and other civil matters, the right of suffrage was confined to “church members in full communion.” Ord. 1631, 1660 (Anc. Chart. 117.) Each town was required to provide suitable houses for public worship at the expense of the town, and no person whatsoever, without the consent of the town, or the order of the general court, was permitted to erect or make use of any house for public worship. Ord. 1679. (Anc. Chart. 105.)
When, by the increase of population, towns became too large conveniently to worship and transact their parochial business in one place, they were divided, and separate parishes established with the same parochial duties and liabilities which towns had before exercised.
For about a century all the inhabitants of towns and parishes, without any exception, were holden to pay ministerial taxes. Then the anabaptists and quakers, having conscientious scruples as to the right of taxation for the support of public worship, were exempted upon certain conditions. This was by a temporary statute, which was continued from time to time till 1757, when it was made permanent. Anc. Chart. 699, 782.
In 1742, episcopalians were exempted from taxation for the erection of meetinghouses in the parishes where they resided ; and were allowed to have their taxes for the support of public worship, when collected, paid over to the minister with whom they usually worshipped. Anc. Chart. 537.
It was, at a very early period, made the duty of every person to attend public worship on the Lord’s day, and on fast and thanksgiving days, under a penalty of five shillings. This subject was revised in 1792, and by the St. 1791, c. 58, which is now in force, every person “ being able of body and not otherwise necessarily prevented,” who shall be absent from public worship on the Lord’s day for the space of three months, shall pay a fine of ten shillings.
By the laws of the province, every town, parish and precinct was bound to support a settled minister, and all the in *348 habitants, with the exception of baptists, quakers and episcopalians, were members thereof, liable to taxation and bound to attend public worship. Such were the provincial laws up to the time of the formation of the constitution of the Commonwealth. In that instrument the people, in their original, sovereign capacity, acted upon the subject. And by the third article of the bill of rights, they empowered and enjoined upon the legislature to authorize and require the several religious incorporations and societies, to make suitable provision for the maintenance of public worship, and for the support of public Protestant teachers of piety, religion and morality.
The only restriction upon the powers here given, and the only qualifications of the duty here enjoined, are that each religious society may elect its own teacher, and every person paying taxes for the support of public worship may have the amount by him thus paid applied to the support of the teacher of his own denomination, provided there be any on whose instructions he attends. In the same article, the legislature is empowered “ to enjoin upon all the subjects, an attendance upon the instructions of the public teachers ” thus to be appointed and supported.
This article is founded on the principle, that it is the right and duty of the people, through the government by them established, to provide for the compulsory support of religious worship, and the attendance of all its subjects upon such worship ; to determine by law, not only what religion shall be established and supported, but to some extent at least’, what particular sects or denominations of that religion shall be protected and maintained.
In the exercise of the power here given, and in the discharge of the duty here enjoined, the legislature have enacted several statutes which it is incumbent upon us here to examine and to construe.
More than twenty years however elapsed, before there was any general revision of the laws upon this subject, and during that period, the laws of the colony and province before adverted to remained in force.
The statute of 1799, c. 87, was revisal of these laws ; *349 ! nd all statutes upon the subject passed before the adoption o -.e constitution, were thereby repealed.
By that statute every town and religious corporation was equired, under a severe penalty, to be constantly provided ! vith a teacher of piety, religion and morality. And every own, parish or "other religious corporation, was authorized to aise moneys for the settlement or support of such public ! eacher or the building or repairing houses of public worship, >y taxation, upon all the inhabitants of such town, parish or [1] ther religious corporation. The only exception was in favor- < f quakers. All others, whether of the same or of a different cenomination, were bound by the assessment. There was however a provision, that those of a different denomination might have the amount of their taxes, when collected, paid over to a public teacher of the same denomination with themselves. The same statute also authorized assessors of parishes to omit to tax, at their discretion, such inhabitants of their parishes as belonged to and usually attended public worship in a religious society of a different denomination.
Under the provisions of this act, all the inhabitants of a parish (excepting only quakers) were liable to taxation for religious purposes. Such only as were of a different denomination and usually attended public worship with another incorporated society, were allowed to have the taxes paid by them, transferred to the minister of their own denomination. Barnes v. First Parish in Falmouth, 6 Mass. R. 401.
Previous to this time the legislature had begun to incorporate individuals into religious societies, usually called poll parishes. Such individuals, though residing within the limits of a territorial parish, were no more considered members thereof than if they had resided without its bounds, and of course were not liable to taxation.
Thus stood the law till June 18th, 1811, when by the statute of that year (chap. 6,) great and important changes, in relation to religious freedom and the liability of individuals for the maintenance of public worship, were made. By this statute, voluntary associations for religious purposes were invested with many of the rights, powers and privileges of corporations. They were empowered to take, hold, manage and improve any *350 donation, gift or grant which should be made to them, to choose agents, trustees and other officers necessary for this purpose, and to manage the affairs of such societies and to maintain and defend suits in certain cases.
This statute also enabled any number of individuals to procure their own exemption from taxation, by forming themselves into a religious society, and that too, whether they were of a different or of the same denomination with the parish in which they resided. Holbrook v. Holbrook, 1 Pick. 248. It gave to the minister of such society the same rights, privileges and exemptions which were enjoyed by a minister of a parish or incorporated society. It also gave to the members of such societies the same right to have their taxes paid over to their own minister, as if their societies had been incorporated ; and the members were exempted from taxation in any parish or other religious society.
But members of such voluntary associations, were exempted only upon condition that they filed with the clerk of the town a certificate of their membership, in the manner prescribed by the statute. And this exemption continued only so long as their membership continued. When that ceased, they again became liable to taxation in the parish in which they resided.
The statute of 1823, c. 106, was in addition to that of 1811, c. 6, and did not expressly nor by implication repeal any of the provisions of the latter.[1] It provided a new mode of organizing a voluntary society, and of certifying the removal of a member from one society to another. It also contains other important provisions, but nothing which necessarily conflicts with the statute of 1811. They both may well stand together. And it is optional with individuals, whether they will avail themselves of the provisions of the one or the other of these statutes.
From this review of the several colonial, provincial and republican statutes upon the subject of public worship and the duties and liabilities of the people to contribute towards its support, it is obvious that certain general and leading principles run through the whole, even down to the present day. They *351 may have been relaxed and modified, but never have been abandoned. Some of them are,—that a religious establishment and public worship ought to be maintained by legal coercion, — that every member of the community ought to be compelled to contribute towards its support, and to aid by his attendance upon public worship, — that the religion thus to be established and supported ought to be not only Christianity, but the Protestant Christian religion, — that to attain these general objects, the Commonwealth ought to be formed into territorial corporations, — and that every inhabitant of the territory thus incorporated is liable to taxation, unless he can claim exemption by showing himself to be a member of some other religious society.
These principles are important and enter deeply into the constitution of civil society. Whether they are consistent with the natural rights of man — whether they interfere with the relation which he bears and the duty which he owes to his creator—whether it be the province of civil governments to establish by constitutional or legal enactments any religion — whether civil power can ever, righteously or advantageously, be exerted to enforce the worship of God — whether it be wise to embrace in a most interesting relation all the individuals, however dissimilar in their feelings and opinions, who may happen to reside upon the same territory — whether the forced observances of the external rites and ordinances of religion tend to promote a devotional spirit and sincere piety — are questions, however interesting and important in themselves, unsuitable for judicial investigation. They more properly belong to the legislator and the statesman.
To apply the foregoing principles to the case under consideration. The plaintiff was an inhabitant of, and liable to taxation in the First Parish in Malden, before and until April 1828, when he became a member of the voluntary association then formed. By the statute provision above referred to, he ceased to be taxable when he joined the new society. And this exemption continued so long as he continued to be a member. But the moment this membership terminated, the exemption terminated, and his liability to taxation in the First Parish was revived. The assessors of this parish were bound *352 to include him in their assessment. They had no discretionary power to omit him, even had he continued to worship with the voluntary society of which he had recently been a member. The discretion of the assessors, by the fifth section of the statute of 1799, c. 87, extends only to persons of a different denomination. The report shows that the plaintiff was of the same denomination as the First Parish.
As the plaintiff was liable to taxation in the parish, and the narish was by law bound to assess him, if it made a tax, it necessarily follows that he was a member of the corporation and had a right to vote in all its meetings- The liability to taxation is the criterion of membership. It cannot be pretended that a man may be holden to pay parochial taxes and yet have no voice in the disposition of the proceeds of such taxes.
If, instead of joining this voluntary association, the plaintiff had removed into another town in April, and again returned to bis residence in Malden in July, it is very clear that by his return he would have become revested of all his parochial rights, as well as of his municipal. The case at bar is similar in principle. By uniting himself to another society and furnishing the legal evidence of the fact, he procured his discharge from his liability to the parish. And by dissolving his connexion with that society, he caused a restoration of that liability. And this does not depend upon the will of either party. When a man removes into a town, he becomes a citizen thereof, whatever may be the desire of himself or the town. His removal into the town is voluntary. But having removed, it is not optional with himself or the town, whether he shall become a citizen thereof or not. The same principles apply to parishes. Whether the plaintiff would withdraw from the voluntary society or not, might depend upon his own will. But having withdrawn, his becoming a member of the parish or not did not depend upon any act or volition of either party. It was the mere operation of law.
Wé have carefully examined the statute of 1823, c. 106, which was cited and relied upon in the argument. We have already stated, that in our opinion it did not repeal any of the provisions of the statute of 1811, c. 6 ; and we cannot perceive that it has any material bearing upon the question before *353 us. The second section provides certain modes by which a member of a religious society may leave it without its consent; but does not prohibit a person from withdrawing from a society of which he has been a member, in any other legal method. Incorporated or unincorporated societies may establish by-laws by which they may regulate the manner of receiving, dismissing or expelling members.
We have formed our judgment upon the assumption that the plaintiff had ceased to be a member of the voluntary society before he claimed a right to vote. And such being the fact, we are of opinion that the plaintiff had a right to vote in the parish meeting of which the defendant was the presiding officer, and that for the refusal to receive the plaintiff’s vote the defendant is liable in this action. Ita lex scripta est.
By the terms of the report, the nonsuit is to be taken off and a new trial granted. The only evidence of the plaintiff’s secession from the voluntary society, was the certificate of the clerk. If the defendant entertains any doubt whether the plaintiff was regularly discharged from the new society or not, the question will be open to further examination upon the new trial.[1]

 Shaw C. J. did not sit in the cause.

 See Fisher v. Whitman, 13 Pick. 350; Leavitt v. Truair, 13 Pick. 112.

 See Revised Stat. c. 20, § 4; First Parish in Sudbury v. Stearns, 21 Pick. 148.